Welcome to the Fifth Circuit. We'll call the first case for today, oral argument, United States of America v. Benjamin Martinez, et al. We'll hear first from Mr. Adler. Good morning. I represent Dr. Donovan Simmons, and I will be addressing the issue of the consolidated brief concerning the jury instruction problem. I'll be followed by Mr. Stanley Schneider, who represents Dr. Wynn. He will address the reverse oral court issue. Mr. Sean Kajai will be next. He represents Anna Bagumian. And then last will be Mr. Jack Zimmerman, who represents Dr. Martinez, and will deal with the bulk of our rebuttal. Okay. We'll grant additional time in this case. I want you to stick to your allotted time. I will, Your Honor. Thank you. The homemade jury instruction given by the district court in this case was legally incorrect. It was factually unsupported, and it was also worded in such a way as to raise partially and incompletely issues concerning the idea of deliberate ignorance. There should be before you a comparison sheet between the gold standard, if you will, the Fifth Circuit pattern instruction on deliberate ignorance, and the instruction that the district court crafted in this case to address the request for the deliberate ignorance instruction made by the government tribe. If you look at the two instructions, you can see there are critical components of the law that are contained in the pattern that are not addressed in the instruction given to the jury. The pattern plainly and simply states that you, the jury, may find the defendant had knowledge. If you, again, the jury, find the defendant deliberately closed his eyes to what otherwise would have been obvious to him, those facts are somewhat raised, those concepts are somewhat raised in the homemade instruction, but not in a way that makes it clear to the jury what the law requires of them to consider. The next part of the pattern critically talks about knowledge not being established merely by negligence, carelessness, or foolishness. That concept is completely omitted, those concepts are completely omitted from the instruction that the district court gave to the jury. So in other words, the jury was not told that a negligent defendant, a careless defendant, or even a foolish defendant, is still not one who has the requisite intent to enter a criminal conspiracy. You don't have much time. We have your chart. Let me say, we first urged not to giving even of the deliberate indifference, ignorance instruction. It seems to me that in this case, well, you shouldn't even be giving that one. But he did not give a deliberate ignorance instruction. He gave a circumstantial evidence instruction that has some plausibility, whether we ought to be embracing it or not, is another matter. And I think we can accept that this is not the equivalent of a deliberate ignorance instruction. He was going in a different direction. So what do you say to that? Why is that error? I understand your question, Your Honor. And with all due respect, I think it's important for this panel to consider that this whole instruction came up during a discussion of the deliberate ignorance concept. Well, it did. Well, the different judge actually said, I withdrew or I refused to give deliberate ignorance. And now you're trying to show that why he didn't, in fact, give it in some other way. But we accept that, I think. Correct. That's correct, Your Honor. But I would also remind the Court that when counsel for Dr. Wynn made the last objection to the idea of deliberate ignorance, and we requested, the defense requested that the government not be allowed to argue deliberate ignorance in light of this instruction. The Court said, I can't stop him from arguing about deliberate ignorance. So, again, respectfully, I would submit that although it's not termed a deliberate ignorance instruction by the district court, it's more than just a circumstantial evidence. No, but whether it's error or not, I mean, there's no requirement that a deliberate ignorance instruction be given. What we need to look at is what was given, it seems to me, and was it error to give that instruction. And showing how it's different from deliberate ignorance doesn't seem to get us where you need to go. Let me turn to your question then. The reason any kind of instruction with regard to a defendant contriving not to learn about what was going on in a criminal's case is still error in this case because there was no evidence supporting that instruction. There was no evidence supporting the idea that any defendant had attempted to eliminate evidence. That's what the instruction said, that an attempt to eliminate or minimize evidence could justify an inference of it. There was no evidence of that whatsoever. What makes it harmful, what makes it even more harmful is that there was testimony that another defendant, not on trial, had shredded some files. He was not on trial for this matter at that time. He had pleaded guilty. And so here you have an instruction that talks about attempting to eliminate evidence, which didn't apply to any of our defendants and implies that that could be enough. If you look at the second paragraph of the instruction given to the, the actual instruction given to the jury, it says attempts to eliminate or minimize evidence of knowledge. So we do have harm from this instruction. More importantly, the second paragraph of the instruction that was given says the law permits inferred expected judgments, but it doesn't identify, is that the jury's inferred or expected judgment or from the perspective of the defendant? That was the judge's effort to try to rephrase however you say the adjective of probable, or is it the adverb, I don't know, probabilistic or whatever. He didn't like it in his word. And that's sort of the equivalent of that. But I must say it is, to me, confusing. We'll see what the government says about that. And I agree, Judge. I think it confused the jury because it doesn't say that it should be from the defendant's perspective. That's the role the jury has to step into is what should the jury have, what should the defendant have known, not what does the jury think should have happened. Thank you. You are Mr. Schneider. Yes, Your Honor. My name is Stanley Schneider. I represent Dr. Nguyen. For over 50 years, this court has recognized that a defendant on trial for the commission of a crime in order to negate his guilt may show that other crimes have been committed by others that show at the same time by the same person than himself to negate his guilt. In Holt v. United States in 1965, before the rules, this court set out that standard. In McClure in 77, this court recognized the importance of the defendant's ability to present evidence intended to negate his guilt. In this case, what we discovered was in Arizona, two of the co-defendants pled guilty. I call them Zabin and Edvard because I can't pronounce their last names. They opened the clinic, hired a doctor, and set up an operation that was essentially identical to the clinics in Houston. They ordered the same tests. They hired doctors by internet. And we've prepared a chart that was passed out as a part of our brief with record sites showing the similarities between the Arizona Enterprise and the Houston Enterprise. And so under 404B, this evidence should have been admitted because it supported the defendant's claim of defense, showed their lack of intent and lack of knowledge. It showed how the co-defendants manipulated doctors. And the evidence in this record is clear that doctors have a tendency not to be good businessmen. They don't read documents. They let other people run their businesses and administer their offices. And that's what these doctors relied upon were the shrewd manipulation by Zabin and Edvard, just like they did Dr. Hunter in Arizona. And this evidence tended to negate their guilt by negating their lack of intent and knowledge by showing the pattern of behavior of Zabin and Edvard. Now, in 404B and normal considerations, this court and many other circuits have said that when you're dealing with 404B evidence being offered by a defendant, the same threshold burdens shouldn't be considered because what 403 does, 403 is designed to protect a defendant from unfair prejudice. And by offering this evidence with prejudice, there's no unfair prejudice to the defendant. You have to look at other considerations. The district court has said that this evidence wasn't reliable because there was no conviction. But the Supreme Court has said you don't need a conviction to offer other crime evidence in Huddleston. So what we have here is other crime evidence committed by Zabin and Edvard that is essentially identical in every shape, manner, and form. The government suggests that the dissimilarities that in Arizona they got a stamp, a signature stamp that was used on checks. That the scope of the only 1,300 claims versus 39,000 claims. That the amount of money was small in comparison to Houston. That Dr. Simmons and Martinez supervised the PA versus supervising the doctor. Those dissimilarities are minuscule compared to the similarities in the scope. The opening of clinics, hiring doctors, falsifying patient records. The tests that were being falsely billed were identical to the falsely billed, repeated billing in this case. The billing from the banks was sent not to the doctors but to Zabin and Edvard. The bank statements were sent to Zabin and Edvard. The Medicare statements were sent to Zabin and Edvard. Nothing shows a dissimilarity in scope of the two conspiracies. So you start looking at what is the right, how does the right to present a defense embodies in the Sixth Amendment. How does it tie into this reverse 404B? The issue here is a defendant's ability to present a defense. How do you say to a jury, I was scammed by these guys? Were you prevented in offering an alibis? Dr. Wing testified. But in McClure, this court recognized that a man saying that the informant coerced me into buying dope. And the court said that the district court's refusal to allow other people to testify that the same person coerced them into buying dope also was error. Because it negated, it supported the claim made by McClure himself that he was forced to buy dope by a guy named Carroll. That corroborating evidence tends to support the testimony to the jury to give way to it. The Third Circuit in Stevens recognized the same things. There are identity cases where the fact that someone falsely misidentified somebody else. You haven't saved any time for rebuttals. No, I did not. Mr. Resimian is going to do my rebuttal here. You need to tell us about your doctor, how he was here. He was here because he testified that I relied on these savages. This is what I did because they told me they were going to take care of it. And Dr. Hunter would have corroborated his testimony by outside evidence showing that these men were the best con men in the world, that they got innocent doctors to commit crimes. Because he did testify and say I didn't do this, I didn't know what they were doing, I didn't see the bank accounts because I relied on them to do it. So that's what happened in my other clinics, that somebody else did the banking, somebody else submitted the bills, somebody else reviewed these things. That's why it was so important to bring the Arizona case in so the jury would have a context that how these men operate. And that's what made it so important that the investigator and the doctor, it wouldn't have taken long to present their testimony. It would have been very simple and straightforward, this is what those men did. And it was identical to what happened here. Identical. And we should have been allowed to present that testimony so that we could present a defense that was envisioned by the Sixth Amendment. And it corroborated it. You have Stevens, you have McClure, and Halter. And the Fifth Circuit precedent says this testimony is admissible and reliable. The district court said it wasn't reliable because there was no conviction. If you look at Beecham, what the court said was when evidence of uncharged offenses is necessary to explain the circumstances setting the charged crime, the district's evidence completes the story of the crime by proving the theory of prosecution. We'll just change that to theory of defense. Your time has expired. Thank you. Good morning. I'm Sean Kajian for Anne Magumian. The problem with the inferred expected judgment instruction was that, especially as to Ms. Magumian, there was no one that testified that she acted in a way to either deliberately ignore what was happening, although, of course, the court did not state the instruction as a deliberate inference instruction. But there were two witnesses that essentially testified as to Anne Magumian. One was Frank Montgomery and the other was Syrian Mirza Hania. Mr. Montgomery testified that he was paid to bring the patients to the clinic, not that Anne Magumian knew that the money was then in turn paid to the patients. As well, Mirza Hania testified that he believed that initially that the money given to Montgomery was to bring the patients there. The problem with this inferred expected judgment instruction is that the jury can take that instruction, apply it to Ms. Magumian, and say that she should have known that or if the judgment would be inferred upon her that she should have known about the totality of the conspiracy, that the money was going in turn to pay the patients, but there was no evidence of that. She did not testify. And so there was no evidence to support giving that instruction as to Ms. Magumian. She received a 51-month sentence. She earned $45,000 during her involvement in this for the one year that she worked at these clinics. That sentence was substantively unreasonable. She had no control over her job duties. She had no control over what anyone else did. The benefit she received was, of course, unremarkable. And so that was why a minor role reduction should have been given to her. So procedurally, a minor role reduction was appropriate, especially after the comment C to 3B1.2. The district court was fixated on his belief that she had an essential role, but that's not true. There were four other technicians that worked there. Two of them, HS and VT, also cashed checks. They did the same things that she was accused of doing. They were not charged at all. The district court said, well, they're not before me. They haven't been charged, so I can't consider them. But no, but you can. You can consider them as to her role, her overall role in the conspiracy, and whether she deserved a minor role reduction. Further, you can consider under 3553 the disparity in sentences. Yes, of course, those two people were not sentenced at all because they were not brought before the district court, but the district court can't turn a blind eye to their existence. And secondly, the district court sentenced the doctors, Martinez and Simmons, to 28 months and 15 months, respectively. While they were responsible for getting the Medicare numbers, they opened, under their names, two bank accounts. Ms. Begumia did neither of those things. For her to receive 51 months was too much, was too much. She had no involvement in the Medicare billing. The government brought a Medicare fraud conspiracy charge to trial. She was not involved in the Medicare billing at all. She had no idea. No one testified that she had any idea at the extent of the billing or that $2.6 million was taken or how much anyone was receiving as a result of the conspiracy. But more importantly, she wasn't involved in any of the Medicare billing. And so a 51-month sentence for someone in her limited role was too much. And to continue to believe that she had an essential role was factually, I don't think, correct. But more importantly, the Sentencing Commission, which promulgated 3B1.2 and amended the comments, the notes, note C, specifically did that because the Sentencing Commission believed that this minor role reduction was being sparingly given and that wasn't the intent. And again, furthermore, the Sentencing Commission made clear that being essential to a conspiracy or essential to a crime is not supposed to be a limitation to giving this reduction. But the important point is that if the district court had given that reduction, her sentence would have been 41 months at the low end. Regardless, a 51-month sentence was too much. What legal error do you say he committed as opposed to the exercise of the Constitution that we really can't affect? The legal error the district court committed was misunderstanding the 3B1.2, its applications and the notes, because being essential is not a roadblock to receiving this reduction. The district court also, like I wrote in my papers, unfortunately believed that she had some sort of familial connection, in my opinion, based on her ethnicity, because the district court to her asked whether she was related to anyone else in the conspiracy, and the only question that the district court posed to that question to anyone else was Pagosian, who just before Ms. Bagumian, the district court had sentenced to 87 months. The district court asked Pagosian, are you related to anyone? And Pagosian said, no, I'm not. Are you related to anyone else in this case? And he said, no, I'm not. And then he turned to Ms. Bagumian and asked the same question. She said, no, she's not. There was no purpose asked to asking that question, because the pre-sentence report indicated no familial connection with anybody. To me, the sentencing of Ms. Bagumian had this apparent viewpoint, from my viewpoint, was there was a racial, unfortunate bias towards Ms. Bagumian, especially considering her sentence, her very limited role, and the very short sentences given to the other defendants who had, well, two of the other defendants that had, in my opinion, more significant involvement in this or were more essential to this conspiracy. So I ask that her convictions be reversed and her sentence be vacated. Thank you. May it please the Court, I'm Jack Zimmerman. I represent Dr. Martinez, and I'm going to do something sort of unusual. I'm going to just talk about the factual sufficiency for Dr. Martinez and reserve the bulk of my time to rebut. If the doctors intentionally joined this conspiracy, the government has some explaining to do. They're going to have to explain to you why patients were paid to lie to the doctor that they saw about their symptoms, and they were told not to tell the doctor that the patients were being paid. If the doctors were part of the conspiracy, why would they have to do that? And why did Dr. Martinez's signature have to be forged on the money laundering account checks? And we have asked the clerk to place before you three pieces of paper. The top page is the acknowledged signature of Dr. Martinez on the application for the Medicare application. You can see that it's Benjamin, and you can see how it looks. If you flip to the next page, this is a government exhibit supporting the money laundering charges, allegedly. And you can see that that is clearly not the same signature. It's B, and it's completely different. There's no Benjamin there. And then you flip to the one underneath it, and that's a third person's signature. So why would they have to do all of those things if, in fact, the doctors were members of this conspiracy? Your Honors, there's definitely a lack of evidence to prove beyond a reasonable doubt that Dr. Martinez intentionally joined an agreement to violate the law. And there's insufficient proof that Dr. Martinez knew that fraud was being committed. And both of those things would have to be shown beyond a reasonable doubt to support all three of the convictions because they're all interrelated. The conspiracy to commit the substantive offenses requires specific intent. The substantive offenses require specific intent. And the money laundering charges require specific intent. And we know from the case law of this Court that the knowledge that is necessary to prove participation in a conspiracy cannot be inferred. And you can't pile inference upon inference. You can't base it on speculation or conjecture or suspicion. I see my red light is on, and I didn't realize how fast two minutes can go. I'll be back in a few minutes. Thank you, sir. You're outnumbered. Ms. Dinello? Good morning. May it please the Court. Elizabeth Dinello for the United States. I'd like to start where Mr. Zimmerman left off and address the sufficiency of the evidence with respect to Mr. Martinez. And if the Court has questions with respect to the other defendants, I'm more than happy to answer those as well. I'd like just to note that in our brief we discussed in detail the evidence supporting the convictions for all four defendants. And I'd just like to highlight with respect to Dr. Martinez several points. First, the patient files showed that the large majority of patients were coming in complaining of neck or back pain. Yet there was zero treatment provided for those conditions. Dr. Martinez, in reviewing those files, would be able to conclude, and should have concluded, that these clinics were not, in fact, in the business of practicing medicine. Second, his signature was on order forms for rectal tests, which were not being performed. The record shows that they were not being performed. There's a testimony of the government's surgeon, Dr. Snyder, who testified that he reviewed 277 patient files where rectal tests were ordered. Not one of them did he believe that the rectal tests were actually performed. That's corroborated by the testimony of the patients who came in and testified. These are patients for whom rectal test orders were in the files, yet these patients themselves testified they had not undergone such procedures. Does Dr. Martinez's signature mean that he was the one who was supposed to have conducted the test, or just that he ordered it? That he was approving the test because the evidence was that he was merely reviewing the files, and that was a suspicious circumstance that also supported an inference of actual knowledge, in that Martinez was reviewing the work of Dr. Nguyen, and there was no innocent explanation suggested for why that would be necessary, particularly when Nguyen is there in the clinic, he holds himself out as a physician. There was no reason that Martinez should have been reviewing that. Were results reported back to Martinez? They were not, but given the evidence that these tests are unusual, they're extraordinary, they require significant preparation, they're intrusive, they're uncomfortable, Martinez, as the other doctors, knew that these clinics were not prepared to perform these procedures. And indeed, Dr. Simmons acknowledged that in his interview with Special Agent Deimert, when he said, yeah, this is not the type of test that a family clinic is set up to do. So, and just to close the loop further, Martinez's signature was on a number of the patient's files where these rectal tests were ordered, and I refer the Court to Government Exhibit 124B, which is at pages 9, 4, 3, 0 to 3, 7 of the record. It lists the 277 patient files that Dr. Snyder reviewed where rectal tests were ordered, and lists the name of the physician who was on those order forms. You'll see all three doctors on that list, and Martinez on a number of them. In addition, the patient files themselves, the additional patient files, show his signature on those forms, approving the rectal tests which he knew were not performed. Lots of them were ordered for back or neck symptoms? Yes. Yes, Your Honor. And also ordered for chief complaints that, or excuse me, ordered for in-office diagnoses that had nothing to do. For example, Kimberly Rogers is diagnosed with nocturia, which the evidence of trial explained was excessive urination at night. She is given a rectal test. There are patients who come in complaining of back and neck pain. They're given rectal tests. And moreover, there are patients like Mary Reeder who was ordered and Martinez signed off on the orders for multiple tests on the same day, electromyography and rectal sensation. So the test itself shows a fraud that Mr. Martinez, excuse me, that Dr. Martinez was aware of. Counsel, does the government accept, or at least is the evidence undisputed, that these marketers, or whatever the word is that was used for them, would tell the patients not to explain what was going on to the doctors, not to say that they had been corralled and urged to go into the doctor to complain of certain things? We don't dispute that the patients themselves were not telling the doctors that they had been paid. There was no evidence that there was that. Was there evidence, I guess it's testimony, that Mr. Zimmerman or somebody was talking about this in the briefing at least, that they were told not to mention this to the physicians? I assume some of the people testified to that effect? Yet when the patient- So how does that all fit with the government's theory of the case? Well, number one, it wouldn't be surprising that the clinic operators were trying to present a facade of an operating clinic. You have the danger of an investigator coming in. It makes sense that the payments are not in the clinic, that there are patients physically in the clinic, that there are physical files. So to the extent some stuff was hidden, that is consistent with a plan to defraud Medicare. With respect to these doctors, even though the patient may have been lying to the doctors about their conditions, nonetheless, Dr. Nguyen, who saw all these patients, would have recognized that these conditions were not accurate. Furthermore, with respect to the other doctors, the tests that were ordered didn't align with the complaints that the patients are coming in with. We have Ellis Johnson, for example, who comes in complaining of back pain. He's given an allergy test. We have, again, these rectal tests for patients who have no rectal problems or symptoms that would justify that test. When Dr. Snyder explains why these tests are done, the kinds of patients who need them, those are not the patients who are walking in the door here, and the files do not reflect that. So the files themselves support a finding of actual knowledge. And I've mentioned the suspicious circumstances. In particular, the reviewing other doctors for no legitimate reason, but also the fact that these patients, none are referred by a primary care provider, despite the fact that Dr. Snyder testified some plans require that. That's at page 2082. Every single one of these patients happens to be on Medicare, and these doctors are getting paid a lot of money. Now, even Martinez, who's being paid essentially $3,000 an hour, one of the defense witnesses, Dr. Witten, testified that when Martinez had been working at UT Southwestern, he was making $220,000 to $240,000 a year at $3,000, and that's at page 2939 to 40. At $3,000 an hour, he'd only have to work 80 hours to make up the entire year's salary. So the suspicious circumstances, perhaps individually, would not support a finding of guilt. Well, explain that number. I'm sorry. I should have let you finish. But explain that number. I thought that the evidence was that one of the doctors was paid $7,000 a month, another $8,000, another $10,000. So what's that figure you just gave me? Where does that come from, that he was only there for two hours a month? Yes. The evidence of his flight time to Houston shows the number of hours that the maximum number of hours he could have been at the clinic. He flies into Houston Hobby Airport, drives to the clinic, can only be there so many hours before his flight out. So if he's only there for three hours and he's making this amount of money, that's how we're doing how much he's making per hour. I have no way to measure whether that amount per month is out of line. Was the evidence you had basically what you told us about somebody was getting paid at some other location of $250,000 a year? Did you have anything? I mean, this is an unusual arrangement. You've got to encourage the doctors to do it. I mean, you have a different view of exactly what's going on. But if it's legitimate, you've got to come up with enough money to encourage them to come up and do what's necessary to be done. And is there any testimony about what doctors who are legitimately involved in such things are paying? No, and to be candid, one of the defense witnesses testified that he thought this was a reasonable amount of money. Let me, though, note the caveat that that witness was not asked is that reasonable in the context of a doctor reviewing another doctor, a doctor flying several hundred miles to the medical clinic. He was talked about just generally being a director of a medical clinic. But even if, taking your point, sir, that there was no direct evidence that this amount was unusual, this court in Varson noted without, again, any specific evidence that I believe there it was $7,000 a month, that that amount of money that was paid to a doctor for similarly reviewing files was a factor that the jury could consider in supporting a finding of actual knowledge. Do you know if there's any testimony in Varson? I saw that number in there, but I didn't sure. It may have been based on evidence that was introduced as to that being out of line. But the opinion doesn't mention that testimony, so I can't make that assumption that there was testimony. Let me ask you about Dr. Simmons. My understanding of Dr. Simmons, he was never there during the week. He would come on the weekends. Some of your evidence is that these marketers were wandering the halls and whatever. Some of the evidence you have to support knowledge would not apply, it seems to me, to Dr. Simmons. Is he the only one who was not there with patients at the time of patients? That is correct. There's no evidence that patients were there on the weekends when he was there. But the fact he was not there physically when marketers were openly wandering the hallways doesn't lessen the really compelling interest of actual knowledge here because he is reviewing the same files which show the mismatch between the patient complaints and the test orders, the utter lack of patient care, the orders for the rectal tests which are not being performed. He's also got a sweet deal in terms of the money he's making. Even putting that aside, he admits in his interview with Agent Deamer that he has signed blank checks, another factor that the court in Barson, I believe, suggested is a relevant factor. And then additional facts that would support this inference of knowledge with respect to Martinez and the other doctors, the applications that they fill out, their enrollment applications where they fail to disclose that, well, actually they make false statements that there are no managing employees, there are no other doctors, that they are doing the billing. The jury reasonably could infer that they knew about what they were signing. The judge instructs the jury that there's a presumption that a person commits to what he signs, and there was nothing to overcome that presumption. Even the defense witnesses who talked about how doctors don't always read what they sign, they were talking in the context of an established medical practice. There was no evidence that doctors routinely signed forms when they have no existing relationship with these entrepreneurs. And then finally, the suspicious behavior of Simmons and Martinez. Once the investigation gets going, Simmons closing the practice or closing his bank account two days after the search, Martinez sending the letter from Martinez notifying his patient that he's closing the practice within the same month that Medicare sends a prepayment notice. Now, to be sure, there could be other inferences drawn from those actions. Perhaps there's an innocent explanation, but the evidence here must be viewed, of course, in the light most favorable to the government. And it's the evidence as a whole we support that shows not only sufficient, but indeed overwhelming evidence that Martinez, as well as the other doctors, knew exactly what was going on. Let me ask you about Dr. Nguyen. There was evidence, I thought, that he had basically the same role with seeing patients who was operating by himself, and then at some stage he falls under the supervision or whatever of Dr. Martinez or maybe probably not Dr. Simmons, I guess. Is there any explanation of that? May I correct? Is there evidence he was initially operating by himself and then no longer is? Is that just a fact and what to make of it is up to the jury, or is there some better explanation? The timing suggests an explanation. The explanation being that the clinic operators were worried that Nguyen was getting hot. What do you mean, that he needed to be kept under control? No, that Medicare may have been one of them. And the timing that I'm referring to is that Nguyen was seeing patients and Medicare was being billed under his number at the first clinic, Jefferson. That closes, immediately Peace opens. Nguyen is still seeing patients, but the bills aren't going out under his number. They're going out under Martinez and Simmons. Then Peace closes and Southwest opens and Nguyen picks up and starts. The bills are going again under his number, although it's not under his name. He's now Southwest rather than his personal name. From that chronology, the jury could infer that the reason that Martinez and Simmons were brought in and that the bills were going out under their name was that they were concerned about using Nguyen too much, even though he was the one still seeing the patients. Let me continue on, perhaps working backwards, to the issue of the Arizona scheme. And note that although I believe it was Mr.—I can't remember which attorney it was— talked about it being essentially identical. In fact, there were significant differences between that scheme and this one in that— excuse me, it's Dr. Nguyen's attorney— in that the Arizona scheme did not have the obvious or some of the obvious indicia fraud that we have here. For example, junior doctor reviewing more senior doctor, patients all not being referred by a primary care provider, patients all on Medicare. And in fact, there was no evidence regarding the Arizona scheme or no proffer regarding the Arizona scheme as to what the patient files would have shown. And that makes sense because the proffer was based on an affidavit for a search warrant to search that clinic. So there was no information at the time as to what the patient files might show. And indeed, it's even unclear as to whether that doctor even would have testified, Dr. Hunter. There was no proffer that he would in fact testify, and he may well have had a Fifth Amendment reason not to testify. Well, counsel, as I recall the briefing at least, I looked at the details of the Arizona scheme beyond that. It was a prosecution decision not to charge the doctors in that, and some statements that they did not consider the doctors to have been part of the conspiracy. What was the evidence particularly exonerative of the doctors in the Arizona scheme that might have affected the jury? I believe there was no prosecution in the Arizona case. So it wasn't just that the doctor wasn't prosecuted, but the clinic operators were not prosecuted. But they were charged, were they not? They were initially charged, and the charges were dismissed. Right, but the doctors were not charged. At that time, but there had been— Is that the only evidence? But wasn't there testimony or offered testimony or evidence of someone connected to the Arizona scheme that the doctors were not considered to be complicit? The only—that would have been based on the investigator again, but before there had been any review of the patient's files, that would show exactly what the doctor knew. So we don't—without review of the patient's files, there's no way to know whether the files show the obvious indicia of fraud that we have here, of utter lack of patient care, of these test orders not aligning with the patient complaints. Furthermore, the doctor in that case, all he said was—this was according to the defense proffer— was that he had no memory of signing off on rectal orders. Leave him at the limb, because what does that mean? Does that mean that he in fact never ordered rectal tests, that he just didn't recall what he'd signed or that he didn't recall signing rectal tests? So the proffer itself is weak, but moreover, on the other side of the balance, and this is a balancing test. And contrary to Mr. Schneider's suggestion, 4.3 is not simply a defense-oriented rule of evidence. It's one that gives the district court discretion to consider a number of factors, including jury confusion, waste of time. Those are not designed necessarily to protect the defendant, but to protect the integrity of the process. And here the judge properly considered the fact that for the defense to present this evidence, there would essentially have to be a trial within a trial. We already have a long and complex case. The judge did not abuse his discretion in excluding it here. Did the proffer indicate what witnesses they wished to call, how they would have presented this? No. The proffer talked about the investigator who would testify. The investigator himself could not talk about what the doctor said, because that presumably would be hearsay. There is some suggestion that the doctor would testify and that the doctor would be expected to say, but there was no proffer that the doctor, in fact, would agree to testify. And as I mentioned earlier, the doctor may well have had a Fifth Amendment concern that would preclude him from testifying. Let's turn, if we may, to talk about the court's instruction. Let's do that. Let's do that. And to follow up on a point you made earlier, Judge Southwick, that this was not a deliberate ignorance instruction. It was essentially a circumstantial evidence instruction. And read as a whole, which, of course, is how a court's instructions must be read, the district court's instruction here did not allow the jury to convict on a lesser standard or leave the jury with a misimpression of what the correct standard was. Now, the appellants have focused on the phrase, inferred, expected, and you suggested that would be a point of conversation now. We agree that this language is not the clearest expression of what the judge was trying to say. The judge was substituting probabilistic. None of the defendants objected to the substituted language. They did. I mean, I think one, maybe, I thought one of the parties did not object to the overall instruction, but I thought the rest did object to the overall instruction. To the overall. But when the judge comes back with this new phrase, nobody says, ooh, that's a problem. That's what is suggesting a negligent standard. Are you saying that the appellant waived that in some way? You would like us to say that, probably, but have they really waived it? We don't rely on a lack of preservation argument. We're not relying on plain error here because within the abuse of discretion, recalling, of course, that a judge does have broad discretion in fashioning jury instructions, we don't think that the judge here gave the jury the wrong, either in the state of the law or so confused the jury that the jury would not have understood. Now, let's talk about inferred expected, which the appellants argue would have allowed the jury to convict based on a finding of mere negligence. That's not, however, the natural reading for several reasons. One, the placement. This is a sentence that the law permits inferred expected judgments to count as knowledge. In the sentence right before, the judge says knowledge does not require certainty. Read together, what the judge is saying here is that for a defendant to know a fact, a defendant doesn't have to know it for certain. It's enough if the defendant infers and expects it to be true. Second, expected here is paired with inferred. Now, to infer means to conclude, to deduce by reasoning. It doesn't make sense that the judge would be talking about what is inferred of a defendant. The more natural reading is what the defendant himself infers. And then finally, counts as knowledge. The knowledge we're talking about here is the knowledge of the defendant. Again, it doesn't make sense for the judge to say that the jury's expectation of what the defendant should have known counts as the defendant's knowledge. Now, again, we agree that this instruction could have been worded more clearly. But it was not an abuse of discretion. And even if the jury were confused and the judge somehow erred, the overwhelming evidence of actual knowledge would require the court, nonetheless, to affirm. There's no direct evidence, would you agree, of actual knowledge? Isn't all the evidence circumstantial? All the evidence is circumstantial. But it's overwhelming, you say, circumstantial evidence. Yes. And an important point, too, to recall is that at the beginning of its knowledge instruction, the district court specifically tells the jury that in order to convict a defendant, it must find that the defendant acted knowingly and willfully. Defines knowingly as intentionally and more overwhelmingly as with a conscious purpose to avoid the law. That is not a negligence standard. And in returning its verdict, the jury necessarily showed that it did find that these defendants acted knowingly and intentionally. Let me ask you two things about this. One was mentioned by one of your friends on the other side, tips to eliminate or minimize evidence. He argued that that really was for a party's action, individual's action who was no longer in the case, shredding files. What's that sentence supposed to be telling juries? What's the relevance of that sentence? It's important to note that it attempts to eliminate or minimize evidence of knowledge. So it's not physically eliminating evidence. It's flushing the drugs down the toilet. It's eliminating evidence of knowledge. That's a phrase that comes up. At least ambiguous because if you had documents in the file that showed knowledge and you shredded them, that's an attempt to eliminate or minimize evidence of knowledge. Agreed. But the point is that where a defendant does attempt, and we would argue that deliberately is built into that, where a defendant deliberately tries to get rid of or avoid knowing about things that the defendant otherwise would know, just like with the deliberate ignorance instruction, that is circumstantial evidence that the defendant, in fact, I don't disagree with that. I'm just saying that a juror could very reasonably take that to mean if someone was trying to shred documents, that's a problem. So none of these doctors shredded anything. Right, but there was evidence that these doctors did willfully blind themselves to the evidence. That's your point. We're talking about two different things. Right. There was no evidence that the doctor shredded. That was Bagumian who participated in the shredding and some of the others who were not on trial here. But the argument, the instruction was not limited to shredding. It was attempts to eliminate and minimize evidence of knowledge. And the jury could conclude that when doctors refused to monitor the billing statements, the remittances, that they are minimizing evidence of knowledge. And that was evidence on which the jury could rely circumstantially to infer knowledge. The other question I had on this, the last two sentences, the law permits inferred expected judgments. These inferences must be beyond a reasonable doubt. The inference root word infer is in both sentences. I would take a juror likely to read this, possibly to read this, that is talking about the juror's own inferences by that last sentence. Those inferences must be beyond a reasonable doubt throughout the instructions, I guess, at least in various places. Jurors are told your findings must be beyond reasonable doubt. And he, Judge Hughes, uses that infer root word in the previous sentence in talking about the judgments. So it seems to me a pretty good debate maybe in the jury room about just whose knowledge are they talking about here. Again, Your Honor, because the instructions have to be read as a whole, you'll, and it's not on this sheet here, but in our brief, I think it's pages 49 and 50, which lays out the entire knowledge instruction. You'll see that this is the tail end of the judge generally talking about knowledge and circumstantial evidence and talking about how inferences can be drawn from circumstantial evidence. And so when the judge is wrapping up here and saying, of course, any inferences have to be beyond a reasonable doubt, read as a whole, the instruction is telling the jury, here's how you can infer knowledge, but just remember, any inferences that you draw have to be beyond a reasonable doubt. If you were looking, as you've just read, at only those two sentences, I grant there would be more of a problem. But again, the instruction has to be read as a whole. I guess my biggest problem with this instruction is if we approve it in this case, we're going to see it again.  That doesn't mean we reverse if we don't like the instruction. You do have other arguments. You didn't want this instruction. You tried awful hard to convince judges, don't give this instruction. And here you need to embrace it and defend it. So that's what lawyers do, I understand. But nonetheless, how do we get around, I mean, the word sanction means two things. I'm not sure which one to use here, to sanction it by penalizing it or sanctioning it by approving it. Well, I'm not going to tell the court how to write its opinion, but certainly appellate judges know how to express disapproval without finding error. We don't do very well in this category. We have disapproved giving deliberate ignorance instructions for decades. Barson, two years ago, we seemed to be perfectly happy with it, so I'm not sure what to make of it. I'm quite new to the language of that case. But we can't get anywhere with just showing disapproval or dissatisfaction, I guess I should say. Well, with respect to deliberate ignorance, if I could just respond to that, the court has said there are dangers with deliberate ignorance. It should be given in rare cases. But because these Medicare and other fraud cases seem to be coming at a faster pace, the circumstances that support a deliberate ignorance instruction probably are increasing too. So that may explain why this instruction is being given more often in that the facts. And this case is an example. There are many cases where the facts would support what this court has said is the proper standard for giving it. But even if the court is frustrated by the prevalence of deliberate ignorance instructions, at least in these fraud conspiracy cases, that doesn't necessarily mean that it would need to find an abuse of discretion here. The court can make clear that in this case it was not an abuse of discretion. The court does not approve it for future use. Well, even if it's abuse of discretion, it might not be harmful error. Absolutely. That is another route the court can find if the court concludes that it was error and that it was an abuse of discretion. Moving to sentencing. Yes, ma'am. What about the, did Judge Hughes improperly construe the essential language in the guidelines? We've written on this. For the minimal, for the minor participant role? No. Judge Hughes appropriately recognized that Ms. Baghoumian was not substantially less culpable than the average participant. The court considered Montgomery, who was one of the marketers, to be a minor participant, and that was appropriate, but did not. Why was Montgomery so different than she was? Because he was bringing patients, some patients, to the clinic. She was working, in contrast, at all three clinics. She was checking in the patients. She was doing some of the reported tests. She was, moreover, helping to pay the kickbacks, which were essential to the scheme. She was getting the cash. She was faking, at least with respect to one rectal test. She played a central, ongoing role at all three clinics. And it was not clear error for the judge to conclude that she, therefore, did not merit the minor participant reduction. You mentioned that video of the test that wasn't really given. Was there substantial video evidence in this case that showed patients with renal probes lying on their buttocks and stuff like that? That's a little worrisome, but is that what was going on in this clinic? No. That video was made by a patient who was cooperating with the government. So we were not invading the privacy of these patients. As I understand, he agreed to the showing of that video. I'll just briefly touch on, by giving these other sentencing claims, with respect to her charge that the judge improperly considered her national origin. The judge never mentioned her national origin, certainly no indication that he based her sentence on her Armenian heritage. And then finally, with respect to the substantive reasonableness, her sentence was within the guidelines, and she's not overcome the presumption that it, therefore, was substantively reasonable. Does the court have any further questions? I'd ask you to affirm the judgment of the district court. Thank you. Thank you, Mr. Court. I think a good starting point for the rebuttal to the argument the governor just made is to recall that the government took this statement in the instruction, attempts to eliminate, and followed it with the sentence, that means you can't turn a blind eye. That's at 3052 in the record. So although the government is here arguing that it's not a deliberative instruction, they used it as a deliberative instruction. The harm that comes from that is that there was no balancing instruction, there was no good faith instruction, although both were requested, and there's no language about negligence, carelessness, and foolishness not being sufficient. I also think it's important for this court to keep in mind that the district court, by the time we got around to sentencing, clearly recognized and had made a mistake. Dr. Simmons and Dr. Martinez were released on bond pending appeal, and the standard, as this court knows, for getting a bond on appeal, is that there's a substantial question in the appeal that is likely to lead to reversal or a new trial. That's the district court making that finding, and that's at 81661 and 80248. So I think by the time sentencing came around, months after the trial, when the motions for bond pending appeal raised the very issues we're discussing here today, the district court recognized it had made a mistake. Were they ever required to serve time after that? Because the district court felt the appeal was going to raise a substantial issue likely to lead to reversal or a new trial, they have not been in custody. But it wasn't like a time-served situation? No, no. They are pending 15 and 20-some-odd months, respectively, for Simmons and Martinez. Only those two doctors, not Dr. Nguyen? Dr. Nguyen was taken into custody. Ms. Begumia was taken into custody. I think it's also important for the court to recall that as the government stood here and argued about these rectal tests that were billed, the evidence was undisputed, and this is at 4902 to 4912. None of those tests were billed in files that Dr. Simmons reviewed. Zero. So the test that the government points to saying that, oh, Dr. Simmons should have known, none of those were in the files that he reviewed. Now, with regard to his salary, the testimony was undisputed at 2768 in the record that this was not an unusual salary. The other problem with this instruction is it doesn't address, as I said earlier this morning, that the jury should look at it from the perspective of the doctor. Dr. Simmons got an acceptable salary. He did not know at the time how much work was going to be involved. He did not know how long he was going to have to come to visit Houston to inspect the files. Mike, the co-defendant, was going to tell him how many files to review, and then he stopped working after five months. So by the time he realized what was going on, he was gone. There's no evidence that he closed a bank account because of a search warrant. There's no evidence that he even knew about it. The instruction was incomplete. It was not a correct statement of the law, and it did, in fact, cause harm to Dr. Simmons. Thank you. I watched that video of Ms. Bagumian, and as a technician, it's clear that she did not know what she was doing in that video. But as to the charges, as to this jury instruction, the law permits inferred expected judgments, the jury would take that instruction and infer and expect that Ms. Bagumian would know that what she's doing in the video was guilty knowledge of a health care fraud conspiracy happening. But that's a big leap. There's no evidence. No one testified that she knew that that, for example, that activity that's shown in the video was then billed to Medicare and how much was billed and who billed it. There are two witnesses that I asked the court to examine. There's thousands of pages, but Montgomery and Mirzakhanian, they support that there was no knowledge on behalf of Ms. Bagumian as to a health care fraud conspiracy. Specifically, even though it's true that the testimony was that she handed money in envelopes to Montgomery, the law requires us to kick back knowledge that the money is used for remuneration for services related to health care. But it's not. There's no testimony from Montgomery that the money that she knew, that Anna knew, that the money was then paid to the patients. Montgomery didn't testify to that. Mirzakhanian didn't testify to that. It would be pure speculation to say that the misleading instruction, this inferred expected judgments instruction, that allowed an alternative method of finding knowledge had no impact on the verdicts, Sullivan versus Louisiana. So for these reasons, the convictions of Ms. Bagumian should be overturned and her sentence vacated. Thank you. Your Honor, there is no evidence in the record that Dr. Martinez ever met with patients or ordered any tests. So I'm not sure how the government is attributing some of that alleged misconduct to him. The expert testimony was uncontradicted that Dr. Martinez complied with industry standards. For example, there was no question that there was testimony that the pay he received was reasonable. And the 404B evidence would have corroborated this when you compared to what the doctor received in that scheme by these exact same clinic owners and criminals, frankly. And let me say also that Dr. Martinez and Dr. Simmons never ordered any tests. I'm not sure why they're being attributed to having ordered any tests. They reviewed what other doctors ordered. They didn't order any tests themselves. They were limited to reviewing files of patients of another doctor. Now, the question becomes, in the government's presentation, they're holding the doctors, at least Drs. Martinez and Simmons, responsible criminally for not looking at the billing records. I want to emphasize that there were billing records and business-type records that were available to be viewed in the clinic. What Dr. Martinez and Dr. Simmons were hired to do was to review the medical records, not the billing or business records. And so to say that they could have or should have looked in them to determine whether or not there was something awry going on is not accurate. I mean, that's not what they were charged with. Is there evidence that they reviewed files where someone came in complaining of a backache or neckache in tests that did not relate to those parts of the body that were ordered? Yes, I believe there is. But remember, they're coming in after the fact. They don't know what happened after that. And they're reviewing these files for what purpose? They're reviewing a certain percentage of files because they're required to, to see if the correct procedures were being followed. Okay, and they see that exams that have nothing to do with back pain or neck pain are being performed. Now, what was their responsibility if they saw that? There was testimony that, at least as far as Dr. Martinez is concerned, that he wrote notes and told and sent it back to the clinic owners that there seemed to be some irregularities in these particular files. But that's as much as they were, that's only the authority that they had was just to point out that. And I believe there is evidence that that, in fact, was done on a number of occasions. So that's what their responsibility was. They were reviewing what some other doctor did, but they didn't have the authority to order a test or to order a follow-up test, which seemed to be what counsel to the government was implying was their duty this morning. So that's why I'm mentioning that. And was that normal for those doctors to be reviewing the other doctor's work? Is that normal? Yes. To have one doctor review another doctor's work? Yes. Yes, Your Honor. I believe that that's the standard in the medical industry is to have a certain percentage. But why would a clinic want a doctor to do that? Why would they want a doctor to see if the correct procedures were being followed? And that's what I'm saying is that there were, at least Dr. Martinez advised the bosses, if you will, that some of those irregularities that he observed ought to be corrected. But he had no authority to tell the other doctors what to do or not to do, and he reported that to the people that hired him. Was this just make work to pay the doctors for some reason? Well, I don't think that's what it was intended, sir. And I know that it's phrased that way, that one could come to that conclusion the way it depends on how you look at it. But the fact that he spent, when he comes to, when Dr. Martinez came from Dallas to Houston, he was given a certain number of files. He didn't pick which files would be reviewed. The owners left it for him or handed it to him. And when he finished those, his assignment was finished, and then he would go back. He was paid a salary. He wasn't paid on an hourly basis. I just paid $300,000 an hour. I'm sorry? I thought he was paid $3,000 an hour. No, he was paid $7,000 a month on a flat salary, no matter how many files he examined and reviewed. And that wasn't up to him to pick that, Your Honor. If I could move to the 404B issue, I can tell you with a great deal of certainty that had the government wanted to introduce that evidence against the defendant under 404B, it would have come in. No question the judge would have let it come in. The judge would have said, it's up to the jury to decide whether those schemes are sufficiently similar or not. And it should have been the same. What's good for the goose is good for the gander, and that's what some of the cases say. And it should have come in. It should have been a jury question of whether how similar it was or not. The point was, is trying to show that the doctors in this case were the victims of these exact same criminal clinic owners. The exact same. You have the charts. I'm not going to burn time on the rebuttal. You have the chart that we prepared that shows the similarities. And there's certainly enough similarities to have met the test under 404B, under Beecham and some of the other older cases, that don't require it to be a signature anymore. We used to say there had to be a signature offense to come in. Would Dr. Hunter, is it in the record that Hunter would have testified? I don't think that's in the record, Your Honor, because I'm not sure that anybody got far enough to be able to ask him that question. That's the honest answer to that question. I don't know. But the main witness would have been the investigator who sought and got the search warrant. There was a search warrant. There wasn't an arrest warrant. I'm sorry. There were charges filed. Why they were dismissed is a mystery. We don't know why they were dismissed. It was a state court prosecution. My guess would be, if I had to give you an answer, my inference would be that it was a federal case and the feds told the state to back off. And then somebody decided it wasn't sufficient to take it to the federal court. So, if I may, I see that my red light's on. I have to make one final comment, if I may. The government said again this morning, I think it answered Jed Sapler's question, that the evidence is overwhelming. If the evidence is overwhelming, then they shouldn't have gotten the deliberate ignorance instruction to start with. And in our brief, we quote the exact same exchange that I had sitting at the same podium before a different panel of this court, sitting in those same chairs, where the judges asked, what do we need to do to keep these district judges from keep giving this instruction on deliberate ignorance that we keep saying should not be given, except in the rarest of circumstances? My answer remains the same. Unless you reverse a case, they're going to make up things. They're going to put their own knowledge into that. They're going to see if they're smarter than the Supreme Court dissenting judge. Judge Sapler pointed out something. If you don't reverse this case on that, you're going to see that again. And they're going to say, hey, the circuit approved it. There's nothing wrong with this. And then the next judge that wants to start changing the standard jury instructions out of the pattern charges is going to make some other instruction up. So, my red light's on, and I just urge you to put some teeth into the statement that says don't give this instruction anymore. It's not proper, especially when you say there's overwhelming evidence. Thank you, Your Honor. Thank you. Thank you.